IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| AZTEC OIL & GAS, INC. § | |
| § | |
| Plaintiff § | |
| § | No. 06-0055 |
| vs. § | |
| § | (JURY DEMANDED) |
| § | |
| Z2, LLC, BUSINESS AND § | |
| FINANCIAL CONSULTANTS, § | |
| LLC, ZEUS, LLC, RICHARD J. § | |
| BEDNAR, AND MARC BALDINGER § | |
| § | |
| Defendants. § | |

## AZTEC OIL & GAS, INC.'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Aztec Oil & Gas, Inc. ("Aztec" or "Plaintiff"), Plaintiff in the above-styled and numbered cause, and files this Original Complaint (the "Complaint") against Defendants Z2, LLC ("Z2"); Business and Financial Consultants, LLC ("BFC"); Zeus, LLC ("Zeus"); Richard J. Bednar ("Bednar"); and Marc Baldinger ("Baldinger") (collectively "Defendants"), and for cause of action shows:

### I. PARTIES

1. Aztec is a Nevada corporation with its principal place of business in Houston, Texas.

2. Z2, LLC is a Florida limited liability company with its principal place of business at 850 SW Lighthouse Drive, Palm City, Florida 34990. Z2, LLC may be served with process by and through its manager, Marc Baldinger, at 850 SW Lighthouse Drive, Palm City, Florida 34990, or by and through its registered agent, Spiegel & Utrera, P.A., 1840 SW 22nd Street, 4th Floor, Miami, Florida 33145.

3. Business and Financial Consultants, LLC is an Oklahoma limited liability company with its principal place of business at 1350 S. Boulder, Suite 301, Tulsa, Oklahoma 74119. Business and Financial Consultants, LLC may be served by and through its registered agent, Jean Walpole Coulter, 1638 S. Carson, Suite 1107, Tulsa, Oklahoma 74119.

4. Zeus, LLC is a Florida limited liability company with its principal place of business at 610 NE Jensen Beach Boulevard, Jensen Beach, Florida 34957. Zeus, LLC may be served with process by and through its manager, Marc Baldinger, at 610 NE Jensen Beach Boulevard, Jensen Beach, Florida 34957 or 850 SW Lighthouse Drive, Palm City, Florida 34990, or by and through its registered agent, Spiegel & Utrera, P.A., 1840 SW 22nd Street, 4th Floor, Miami, Florida 33145.

5. Richard J. Bednar is an individual residing in Tulsa, Oklahoma. Mr. Bednar may be served at his place of business, 1350 S. Boulder, Suite 301, Tulsa, Oklahoma 74119 or 8988 S. Sheridan, Suite L356, Tulsa, Oklahoma 74133.

6. Marc Baldinger is an individual residing in Palm City, Florida. Mr. Baldinger may be served at his residence, 850 SW Lighthouse Drive, Palm City, Florida 34990.

## II. JURISDICTION AND VENUE

7. Jurisdiction is proper in this Court because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs. 28 U.S.C. § 1332(a)(1). In addition, this Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 2201(a). Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claim occurred in the Southern District of Texas.

## III. FACTUAL BACKGROUND

### A. The Parties and Assets In Issue.

8. In 2004, Z2 acquired a 100% working interest in approximately 7,200 acres in the Bigfoot oil field located primarily in Frio County, Texas (the "Bigfoot Field"). The Bigfoot Field was discovered by Shell Oil in 1949 and developed in the 1950s. Over the last five decades, the field has produced over 22 million barrels of oil. Third-party reports indicate that the Bigfoot Field still has over 4 million barrels of oil of reserves. Z2's interest covers the majority of the historically productive areas of the field. Z2 obtained financing to purchase its working interest in the Bigfoot Field from Texas Capital Bank.

9. Z2's membership was initially comprised of a number of entities, with the following respective principals and percentage ownership interests:

| Entity | Principal | Percentage Interest in Z2 |
|---|---|---|
| Zeus | Baldinger | 72.517% |
| BFC | Bednar | 8.083% |
| Parthenon Trading Company ("Parthenon") | Dr. B.P. Loughridge | 16.167% |
| Maverick Energy Group, Inc. ("Maverick Energy") | Mr. James McCabe | 3.233% |

Maverick Energy is Z2's operator in the Bigfoot Field.

10. Each of these members of Z2 also own a net profits interest ("NPI") in production associated with the Bigfoot Field. The NPI is this instance takes precedence over and is paid before any revenue distributions to the members of Z2.

11. In the spring of 2004, Aztec's predecessor, Aztec Communications, Inc., retained SBI Oil and Gas Resource Exploration, LLC ("SBI"), a Delaware limited liability company, and

International Fluid Dynamics, Inc. ("IFD"), a Texas corporation, to consult on corporate restructuring matters. Formal consulting agreements were executed in July 2004.

**B.    Defendants Paint a Rosy Picture.**

12.    In mid May 2004, Maverick Energy approached Aztec (through SBI and IFD) about investing in the Bigfoot Field. In exchange for $3,000,000, Aztec could secure 100% of the working interest in the field through the purchase of the membership interests of Z2.

13.    In late May 2004, as part of Aztec's investigation into the potential purchase of membership interests in Z2, Defendant Richard Bednar, the CFO of Z2 and Manager of BFC, provided IFD with an unsigned copy of a document entitled "Z2, LLC Agreement Between Equity Holders" dated May 10, 2004 (the "Equity Holders' Agreement"). Defendant Bednar stated that only minor numerical corrections would be made prior to signing and that the Equity Holders' Agreement was actually the "final version." At meetings held in San Antonio on June 1 and 2, 2004, Defendant Bednar specifically reviewed this document with SBI and IFD and reiterated its status as the final version of the agreement.

14.    While Defendants represented to SBI and IFD that the Equity Holders' Agreement was a valid and existing contract, no signed copy of this document has ever been provided to IFD, SBI, Aztec, or their attorneys. As the governing document among the members of Z2 that any acquisition by Aztec would be subject to, Defendants also represented to SBI and IFD that the Equity Holders' Agreement was the same document referenced in the draft agreements that were being negotiated among the parties relating to the potential Aztec acquisition of an interest in Z2.

15.    Defendants also represented to SBI and IFD that Z2 had in place a $15 million line of credit with Texas Capital Bank (the "Line of Credit"). As explained to Plaintiff by Defendant Bednar, this line of credit was to be used to increase production in the Bigfoot Field

through workovers and recompletions of existing wells and drilling of new wells. SBI, IFD, and Aztec were comforted by the existence of the Line of Credit as an additional source of substantial funds to sustain and further develop production in the Bigfoot Field.

16. Defendants also made available to Plaintiff various documents and materials showing that production in the Bigfoot Field was, on average, 9,968 barrels of oil per month. Defendants also asserted that this production level was expected to increase in the near future from then-existing wells. For ease of reference and calculation, the parties agreed to "round up" this production figure to 10,000 barrels per month.

17. On June 17, 2004, a summary of acceptable terms was agreed upon by SBI and Defendant Bednar on behalf of Z2, whereby Aztec would acquire 100% of Z2. SBI, in turn, paid on Aztec's behalf a $100,000 deposit towards the purchase price, which was accepted by Defendant Bednar.

18. Following this due diligence and initial agreement, according to Defendant Bednar, Zeus—the majority interest holder in Z2—apparently refused to sell any portion of its interest. Consequently, the prospective deal seemed to be stopped in its tracks.

C.  **Aztec Is Induced to Invest in the Bigfoot Field.**

19. Despite Zeus's intransigence, there was continued communication with Aztec seeking its investment of funds in exchange for an interest in the Bigfoot Field. On July 19, 2004, in an attempt to keep the deal alive, SBI was presented with a revised proposal for Aztec to acquire a total of 31.55% membership interest in Z2, which included a substantial portion of the Z2 interest owned by Zeus. Accordingly, the transaction moved forward.

20. As a result of Aztec's then-ongoing reorganization and Defendants' desire to swiftly obtain a capital infusion, SBI (through an affiliate, SBIOGRE) agreed to initially close

the transaction in its own name and then transfer its interest in Z2 to Aztec—all of which was known to and agreed upon by Z2.

### i. The $1,000,000 Investment in Z2.

21. Effective August 1, 2004, SBI executed three (3) Agreements for Sale of LLC Membership Units (the "LLC Membership Unit Agreements") with Maverick Energy, BFC, and Zeus, in order to acquire a 31.283% membership unit interest in Z2 for the total purchase price of $1,015,000.

22. The LLC Membership Unit Agreements, which were actually executed as late as August 9, 2004, included the following material terms:

| Z2 Member | Percentage Interest Sold | Purchase Amount |
| --- | --- | --- |
| Maverick Energy | 3.20% | $100,000 |
| BFC | 8.083% | $265,000 |
| Zeus | 20.00% | $650,000 |

23. Further, the LLC Membership Unit Agreements expressly state that SBI's (now Aztec's) membership interests in Z2 were acquired subject to the terms of the Equity Holders' Agreement and of the Articles of Organization and Regulations of Z2. Importantly, neither the Equity Holders' Agreement, the Articles of Organization, nor the Regulations of Z2 give Z2 the right to make capital calls on its members.

### ii. The $1.8 Million Loan to Z2's Affiliate.

24. In conjunction with, and as a condition of, SBI's purchase of a 31.283% interest in Z2, SBI was required by Defendants to loan $1,850,000 to an affiliate of Z2—called Z3, LLC (the "Z3 Loan"). The Z3 Loan was guaranteed and secured by Zeus's remaining 52.517%

ownership share in Z2. Originally, the Z3 Loan was to be entered into by Z2, but for unknown reasons, Defendant Bednar insisted that Z3 take Z2's place.

25. Funds from the Z3 Loan were directed to: (a) pay off an approximate $600,000 subordinated loan from Texas Capital Bank, the existence of which had prevented Z2 from making any distributions to its members; (b) repay loans from the original members of Z2, including Zeus and Parthenon; and (c) repay the remaining portion of high interest loan obligations incurred by Z2 to the original sellers of the Bigfoot Field. The Z3 Loan freed up Z2's previously restricted cash flow, ensured that Z2's original members recouped much, if not all, of their initial contributions, and eliminated expensive outstanding debt.

### iii. The $1.4 Million Infusion to Z2's Drilling Program.

26. Apparently not content to secure $2.8 million to develop the Bigfoot Field, Z2 also sought an additional $1.4 million from SBI and IFD to apply towards a new drilling program (the "Drilling Program"). In particular, Defendants represented that they needed funds to drill four new wells, all to a depth of approximately 3,800 feet. Defendants represented that the drilling was all well-defined "infield" drilling and would occur within well-established "sweet spots" in the Bigfoot Field where increased production was sure to follow. In reliance upon Defendants' representations, SBI and IFD entered into a joint venture, Big Foot 2004-1 Drilling Program, LP, and contributed $1.4 million toward the Drilling Program.

27. Defendants subsequently represented to Aztec (as well as Z2's auditors and the IRS) that Maverick Energy was working on a "turnkey" basis regarding the Drilling Program, discussed in more detail below. That is, perhaps in an effort to avoid a conflict of interest situation (since Maverick Energy is Z2's operator while also holding a membership interest in Z2). Maverick Energy agreed to drill and complete the four (4) new wells in the Bigfoot Field from start to finish for a set amount of money determined in advance.

### D. Signs of Trouble Erupt in Paradise.

28. As originally planned, Aztec quickly stepped into the shoes of SBI. On September 15, 2004, Aztec finalized an Agreement for Sale of LLC Membership Units with SBI in which Aztec acquired SBI's 31.283% membership unit interest in Z2. SBI also conveyed its Z3 Loan to Aztec.

29. Oil production began to inexplicably drop in August 2004 around the time the LLC Membership Unit Agreements were executed. Aztec reasonably believed however, based upon Defendant Bednar's representations, that the Line of Credit would be used to fund workovers and recompletions that would in turn stimulate production from existing wells. Defendants also continued to assert that they were improving operations that the previous operator had fouled up and that production for existing, producing wells would be improving soon.

30. Based upon this belief, as well as a memo from Defendant Bednar about his meeting with Texas Capital Bank, Aztec issued a press release on October 12, 2004, announcing its acquisition of an interest in Z2, describing the asset, and stating: "Z2, LLC has already secured a $15 million line of credit from Texas Capital Bank for workover and re-entry of existing wells." Ostensibly after receiving pressure from Texas Capital Bank concerning the press release, Defendant Bednar frantically called Aztec to deny that he had ever claimed the Line of Credit was actually in place. Without any access to or communication with Texas Capital Bank, of course, Aztec could only have learned of the Line of Credit through Z2 (and specifically through Defendant Bednar).

31. In early December 2004, Z2 finally proceeded with the new Drilling Program. SBI and IFD had previously objected to funding this program on an accelerated schedule, as Defendant Bednar insisted, because of the revelation about the Line of Credit (which apparently

did not exist) and the dramatic drop in production from existing wells in the Bigfoot Field (contrary to Defendants' promises).

32. The Bigfoot Field exhibits two main Olmos production zones, the B Zone and the lower D Zone. The B Zone has historically been the greatest source of oil production, while the D Zone consists mainly of natural gas. With no gas pipelines in the field, gas production was never believed to be a focus by Z2.

33. In complete abdication of Z2's (and its operator, Maverick Energy's) responsibility to ensure that the Bigfoot Field is properly developed, Z2 hired a geologist, Benjamin M. Heider, III, to select the drilling locations and oversee operations. Aztec had no influence or input into where or how to drill the four new wells. Incredibly, Heider decided (and Defendants evidently agreed) to drill all four wells within a stone's throw of one another, virtually ensuring that if one well did not produce, the other three would have a high probability of not producing. All four wells were also drilled down to the lower D Zone.

34. Regrettably (but perhaps not surprisingly), only one of the four wells has produced any oil at all from the D Zone, and the one that did amounts to a mere trickle. Despite the fact that well logs could have indicated this lack of future production from the D Zone, Defendants cased, perforated, and fractured all four wells (instead of one test well) down to the D Zone, at a cost of approximately $60,000 per well. Additional work associated with these wells was also performed in a questionable fashion leading to more unnecessary expense.

35. After spending a significant amount of time and SBI's and IFD's money "studying" this already extremely well known D Zone to no avail, Defendants finally decided in September 2005 (some 9 months later) to move up hole and fracture 2 wells in the B Zone. Again, little or no production was forthcoming. In short, despite paying exorbitant rates to Defendant BFC for accounting services and Maverick Energy for operating expenses (contrary to

the alleged turnkey status, which Defendant BFD reported to the IRS and its own CPAs), Defendants have failed to obtain significant production in six of eight possible well zones. Further, the original members of Z2 have all paid themselves NPI payments, even though Aztec has not recovered one penny in distributions related to its substantial investment in Z2.

E.  **Aztec Discovers Defendants' Monkey Business.**

    i.  **Aztec Discovers Someone's Sleight of Hand.**

36.  On or about August 4, 2005, Z2 issued a capital call on the members of Z2 in the total amount of $465,000.00, pursuant to what Defendants Z2 and Bednar claimed was the Equity Holders' Agreement. Aztec's proportionate share of this call was 31.283%, or $145,466.

37.  Upon review of the underlying documents, Aztec discovered that the original Z2 members' Equity Holders' Agreement had secretly been replaced by another version. Apparently following the negotiation for purchase of the membership interest in Z2 by Aztec, *another* equity holders' agreement *dated* May 17, 2004, was created (the "Second Equity Holders' Agreement"). This *unsigned* Second Equity Holders' Agreement was sent to SBI's lawyers by Defendants Bednar and Baldinger and represented to the lawyers as being the agreement that had been discussed with Aztec (through SBI and IFD). This second agreement noticeably includes two (2) new provisions not present in the Equity Holders' Agreement provided to SBI, including a provision allegedly authorizing capital calls to be made on the members of Z2. Interestingly, the fax headers on the signature pages of the Second Equity Holders' Agreement (dated May 17, 2004) provided to SBI and Aztec by Defendant Bednar, over six (6) months *after* the LLC Membership Unit Agreements were executed, bear dates ranging from August 1 through August 20, 2004.

38.  Although it is dated "effective" May 17, 2004, on information and belief, the Second Equity Holders' Agreement was not executed until *after* SBI executed the LLC

Membership Unit Agreements in August 2004. Further, SBI was never informed of or provided with a signed copy of the Second Equity Holders Agreement (including the extra two provisions) until *after* the LLC Membership Unit Agreements were executed. Simply stated, neither SBI nor Aztec agreed to be bound by a secret, collateral agreement that included the two (2) additional, objectionable provisions.

39. On August 4, 2005, Z2 notified Aztec of a capital call on the members of Z2 in the total amount of $465,000. According to the notice letter, Aztec's 31.283% "share" of that amount was $145,466—surprisingly close to the amount that was then left due and owing in Aztec's loan to Z3. On November 10, 2004, through its lawyers, Z2 declared Aztec in "default" of the Second Equity Holders Agreement and again demanded that the capital call be paid in full. The Z3 Loan was recently repaid in full by Z3 on November 18, 2005. For the reasons stated herein, Aztec denies that any payment is due (much less in default) because the capital call is not legitimate. Of course, had Defendants not mismanaged Z2's assets or distributed NPI payments to its original members, Z2 would not have needed to make a capital call on Aztec.

    **ii.    Z2's Geologist is Aggressively Pitching a Declining Investment.**

40. Aztec recently learned that Mr. Heider was promoting investment in the Bigfoot Field to Deep Rock Oil & Gas, Inc. ("Deep Rock"), a public company based in Tulsa, Oklahoma. On information and belief, Mr. Heider was using an updated August 2005 reserve report in connection with his sales pitch, even though the report was not provided to Aztec until its existence was independently discovered and a copy was requested by Aztec. On September 20, 2005, Deep Rock issued a press release disclosing that it signed a letter of intent to acquire a 5.825% residual NPI interest in the Bigfoot Field, which, again, takes priority over Aztec's membership interest. Based on Deep Rock's press release, Maverick Energy apparently

represented to Deeprock that it planned to drill 100 additional wells in the field. Deep Rock's acquisition of the residual NPI interest closed on October 17, 2005.

41. It strains credulity to think that Mr. Heider and Defendants are courting others to invest in what—for all intents and purposes—appears to be an unsuccessful oil and gas project based on the results of the Drilling Program, with which Mr. Heider was intimately familiar. In addition, Aztec has brought to Z2's attention that Mr. Heider and Deep Rock possibly usurped an opportunity from Z2 in buying the 5.825% residual NPI using inside information gained via Mr. Heider's employment by Z2. Regardless, Z2 has taken no action against Mr. Heider for his use of Z2 information, including the August 2005 reserve report.

## IV. CAUSES OF ACTION

A. **Count One—Declaratory Judgment**

42. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

43. There is an actual controversy between the parties concerning their respective rights, obligations, and liabilities arising out of the LLC Membership Unit Agreements and various Equity Holders' Agreements. Aztec has no other remedy than to seek declaratory relief from this Court. Aztec is entitled to a judgment declaring that: (a) the Second Equity Holders' Agreement dated May 17, 2004, is null and void; (b) the original Equity Holders' Agreement dated May 10, 2004 is the valid governing document; (c) Z2 is not authorized to issue a capital call under the terms and conditions of the original Equity Holders' Agreement; and (d) Aztec is not obligated under the LLC Membership Unit Agreements to pay any capital call demanded by Z2.

## B. Count Two—Negligent Misrepresentation

44. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

45. Defendants negligently misrepresented to Aztec (through IFD and SBI) a variety of matters affecting its decision to purchase an interest in the Bigfoot Field. Defendants made the misrepresentations in a transaction in which they had a pecuniary interest. Defendants' oral and written misrepresentations and/or omissions include, but are not limited to, the following:

   (a) the original Equity Holders' Agreement presented to SBI and IFD, which did not authorize any capital calls, was the "final version" of the operative document among the members of Z2;

   (b) the existence of the $15 million Line of Credit with Texas Capital Bank, when, in fact, no such credit line was in place;

   (c) the sustained production of approximately 10,000 barrels of oil per month, which would eventually increase;

   (d) the execution of the Second Equity Holders' Agreement was in place before the LLC Membership Unit Agreements when, upon information and belief, it was not executed until weeks afterward.

46. Defendants supplied false information for the guidance of Plaintiff. Defendants did not exercise reasonable care or competence in obtaining or communicating the information orally or in writing to Plaintiff. Plaintiff justifiably relied upon the misrepresentations and omissions made by Defendants.

47. Defendants' misrepresentations and omissions caused Plaintiff damages. More specifically, by justifiably relying on Defendants' misrepresentations and omissions, Plaintiff has

suffered and will continue to suffer pecuniary loss in the form of significant actual, incidental, and consequential damages.

**C.      Count Three—Common Law Fraud**

48.     Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

49.     Defendants made material misrepresentations and/or omissions to Plaintiff, which were made recklessly or with knowledge that the representations were false and/or under circumstances wherein Defendants had a duty to provide additional information. As stated in more detail above, Defendants' misrepresentations and/or omissions include, but are not limited to, the following:

(a) the original Equity Holders' Agreement presented to SBI and IFD, which did not authorize any capital calls, was the "final version" of the operative document among the members of Z2;

(b) the existence of the $15 million Line of Credit with Texas Capital Bank, when, in fact, no such credit line was in place;

(c) the sustained production of approximately 10,000 barrels of oil per month, which would eventually increase;

(d) the execution of the Second Equity Holders' Agreement was in place before the LLC Membership Unit Agreements when, upon information and belief, it was not executed until weeks afterward.

Defendants made the misrepresentations and/or omitted the information in anticipation that Plaintiff would rely upon them. Plaintiff, in fact, relied upon Defendants' material misrepresentations and/or omissions to its detriment, as intended by Defendants.

50. Plaintiff has suffered and will continue to suffer pecuniary loss by justifiably relying on Defendants' misrepresentations and/or omissions. Specifically, Plaintiff has suffered, and will continue to suffer, significant actual, incidental, and consequential damages as a result of Defendants' misrepresentations and/or omissions.

51. Moreover, Defendants made these misrepresentations and/or omissions intentionally and with malice and/or conscious indifference to the truth or Plaintiff's welfare. As such, Plaintiff's damages also include, but are not limited to, exemplary damages, costs of court, related expenses associated with bringing this action, and all pre-judgment and post-judgment interest as is recoverable by law.

**D.  Count Four—Fraud in the Inducement**

52. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

53. In order to obtain the Loan to Z3 and Agreement with Z2 from Plaintiff, Defendants made affirmative misrepresentations and failed to disclose material facts with the intent to mislead Plaintiff about the scope of their wrongdoing. Defendants intended that Plaintiff rely upon their misrepresentations and omissions. Plaintiff, in turn, relied upon Defendants' misrepresentations and omissions to its detriment. But for Defendants' failure to fully and accurately disclose the truth, Plaintiff would not have executed the Agreement or issued the Loan.

54. Plaintiff has suffered and will continue to suffer pecuniary loss by justifiably relying on Defendants' misrepresentations. Specifically, Plaintiff has suffered, and will continue to suffer, significant actual, incidental, and consequential damages as a result of Defendants' misrepresentations.

55. Defendants' fraud in this regard was committed intentionally and with malice and/or conscious indifference to the truth and/or Plaintiff's welfare regarding same. As such, Plaintiff's damages also include, but are not limited to, exemplary damages, costs of court, related expenses associated with bringing this action, and all pre-judgment and post-judgment interest as is recoverable by law.

### E. Count Five—Statutory Fraud

56. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

57. Defendants engaged in fraud in a transaction involving securities and real estate in violation of § 27.01 of the Texas Business and Commerce Code. Defendants made false representations of past and existing material facts to Plaintiff for the purpose of inducing Plaintiff to enter into the LLC Membership Unit Agreements and Loan. Defendants' false promises include, but are not limited to, the following:

   (a) the original Equity Holders' Agreement presented to SBI and IFD, which did not authorize any capital calls, was the "final version" of the operative document among the members of Z2;

   (b) the existence of the $15 million Line of Credit with Texas Capital Bank, when, in fact, no such credit line was in place;

   (c) the sustained production of approximately 10,000 barrels of oil per month, which would eventually increase;

   (d) the execution of the Second Equity Holders' Agreement was in place before the LLC Membership Unit Agreements when, upon information and belief, it was not executed until weeks afterward.

In addition, Defendants represented that they would competently manage the Bigfoot Field. Instead, Defendants have attempted to convert Plaintiff's membership interest in Z2 for their own use and benefit. Defendants made these false, material representations for the purpose of inducing Plaintiff to invest and loan substantial funds to jumpstart a stalled business and then appear to run the business into the ground. Plaintiff in fact relied upon Defendants' false representations.

58. Plaintiff has suffered and will continue to suffer pecuniary loss by justifiably relying on Defendants' false promises and misrepresentations. Specifically, Plaintiff has suffered, and will continue to suffer, significant actual, incidental, and consequential damages as a result of Defendants' false promises and misrepresentations. Plaintiff has also found it necessary to retain the legal services of Porter & Hedges, L.L.P., to prosecute this action and is entitled to reasonable and necessary attorney's fees. Plaintiff's damages also include, but are not limited to, exemplary damages, expert witness fees, costs for copies of depositions, costs of court, related expenses associated with bringing this action, and all pre-judgment and post-judgment interest as is recoverable by law.

### F. Count Six—Breach of Fiduciary Duty

59. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

60. A fiduciary relationship exists between Plaintiff and Defendants. Defendants breached common fiduciary obligations owed to Plaintiff, including the duties of obedience, loyalty, candor, unselfishness, and good faith. By engaging in the self-dealing and other tortious conduct described above, Defendants utterly failed to act in good faith and allowed their personal interests to recover their own investment and regain Plaintiff's percentage interest

to prevail over the interests of the joint venture. In addition, by incompetently managing drilling and production activities in the Bigfoot Field, overpaying Defendant BFC and Maverick Energy, making NPI payments, all leading to the ostensible inability to distribute any production revenues to Aztec as a member of Z2, Defendants attempt to convert Plaintiff's membership interest to its detriment and to Defendants' benefit. To the extent any of Defendants are determined to not be direct fiduciaries of Plaintiff, those Defendants knowingly participated in the breach of the other Defendants' fiduciary duties owed to Plaintiff and are jointly and severally liable.

61. Plaintiff has suffered and will continue to suffer pecuniary loss as a direct result of Defendants' numerous breaches of fiduciary duty. Specifically, Plaintiff has suffered, and will continue to suffer, significant actual, incidental, and consequential damages as a result of Defendants' acts and omissions. Plaintiff's damages also include, but are not limited to, exemplary damages, costs of court, related expenses associated with bringing this action, and all pre-judgment and post-judgment interest as is recoverable by law.

## VII. PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Aztec Oil & Gas, Inc. respectfully requests that Defendants be cited to appear and answer, and that on final trial Plaintiff have judgment against Defendants for:

1. all actual, consequential, and incidental damages incurred by Plaintiff as a result of Defendants' wrongful conduct;

2. certain declarations regarding the rights and obligations of the parties as described herein;

3. reasonable and necessary attorneys' fees pursuant to TEX. BUS. & COMM. CODE § 27.01;

4. exemplary damages;

5. costs of court;

6. litigation expenses pursuant to TEX. BUS. & COMM. CODE § 27.01;

7. pre- and post-judgment interest; and

8. such other and further relief, both legal and equitable, to which Plaintiff may be justly entitled.

Dated: January 6, 2006.

Respectfully submitted,

_____
RAY T. TORGERSON
Texas Bar No. 24003067
**PORTER & HEDGES, L.L.P.**
1000 Main Street, 36th Floor
Houston, Texas 77002-6336
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)

*ATTORNEY-IN-CHARGE FOR*
*PLAINTIFF AZTEC OIL & GAS, INC.*

**OF COUNSEL:**

DAVID L. BURGERT
Texas Bar No. 03378300
**PORTER & HEDGES, L.L.P.**
1000 Main Street, 36th Floor
Houston, Texas 77002-6336
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)

JS 44 (Rev 11/04)

# CIVIL COVER SHEET

H-06-0055

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
AZTEC OIL & GAS, INC.

**DEFENDANTS**
Z2, LLC, BUSINESS AND FINANCIAL CONSULTANTS, LLC, ZEUS, LLC, RICHARD J. BEDNAR, AND MARC BALDINGER

(b) County of Residence of First Listed Plaintiff __Nevada Corporation__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant __Florida LLC__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Ray T. Torgerson
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000

Attorneys (If Known)
N/A

United States Courts
Southern District of Texas
FILED
JAN 0 6 2006
Michael N. Milby, Clerk

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
X 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizens of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place Of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | X | Incorporated and Principal Place Of Business In Another State | X 5 | X 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Bank and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY X 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment Of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 490 Cable/Sat TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | | LABOR | SOCIAL SECURITY | |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff Or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl Ret Inc Security Act | | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access To Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer w/Disabilities - Other | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C § 1332

Brief description of cause
Fraud in an oilfield investment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F R.C P 23
DEMANDS $
CHECK YES only if demanded in complaint
JURY DEMAND  X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions) JUDGE N/A  DOCKET NUMBER N/A

DATE: 01/06/06
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

Receipt # _____ Amount _____ Applying IFP _____ JUDGE _____ MAG. JUDGE _____

907701_1.DOC